

FILED

SEP - 3 2008

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                    Deputy Clerk

ENTERED

SEP - 3 2008

CLERK. U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                    Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>JAMES L. BARKER and JEANNE A.<br>BARKER,<br><br>     Debtors.<br><br>―――――――――――<br><br>JEFF HURRELL and LISA HURRELL,<br><br>     Plaintiffs,<br><br>vs.<br><br>JAMES L. BARKER and JEANNE A.<br>BARKER,<br><br>     Defendants. | Case No.: RS 05-23284 PC<br><br>Chapter 7<br><br>Adv. Case No.: 06-01033 PC<br><br>**MEMORANDUM DECISION**<br><br>Final post-trial hearing:<br>July 31, 2008<br>1:00 p.m.<br>Courtroom 1345<br>255 E. Temple Street<br>Los Angeles, CA 90012 |

# I

## INTRODUCTION

This nondischargeability lawsuit between the buyers and the sellers involves a house in Canyon Country, California. The house was built in 1964. It was purchased in 1984 by James and Jeanne Barker, the defendants. The Barkers lived in the home until 2004 when they sold it for $825,000 to Jeff and Lisa Hurrell, the plaintiffs. The purchase agreement was signed on September 10, 2004. Shortly after, the Hurrells inspected the property and employed several professionals to advise them about the purchase, and they were furnished with various reports and disclosures. On October 9, 2004, after consulting with their professionals, the Hurrells signed off on all contingencies to their purchase agreement regarding their acceptance of the condition of the property. After one final "walk through" inspection on November 6, escrow closed on November 10, 2004.

Prior to the closing, the Hurrells arranged with a plumber to have galvanized plumbing pipes replaced with copper piping before they moved in. The plumbing work required cutting several holes in the walls of the house to access the pipes. While completing his work, the plumber noticed problems that had been hidden from casual observation behind finished walls, and he advised Jeff Hurrell to call for further help. Hurrell called an environmental specialist who examined the house on December 7, 2004 and found mold.

Over the next year or so, the Hurrells partially demolished and thoroughly renovated their home, finding mold, dry rot, cracks in the slab foundation and other problems while they expanded the size of the house, re-graded the property, built retaining walls, installed many new and replacement features and rebuilt the house to their satisfaction.

The Hurrells sued the Barkers and others in state court to seek recovery for what they believed were damages they suffered as a result of alleged improper conduct by the Barkers and the other defendants during the purchase transaction. When the Barkers filed a chapter 7 bankruptcy petition, the Hurrells filed this lawsuit seeking to recover from the Barkers more than one million dollars and a judgment of nondischargeability, for fraud under 11 U.S.C § 523(a)(2)(A), and for willful and malicious injury under 11 U.S.C. §523(a)(6). Apparently, the state court lawsuit has not yet been tried or resolved.

The following are my findings of fact and conclusions of law after a five-day trial and the submission of thousands of pages of lengthy exhibits (including hundreds of photographs), many of which were extraneous to the trial process and lacked internal page numbering.[1]

## II

## SUMMARY

As discussed at length in this memorandum, I have reviewed the purchase agreement and related documents; the written, photographic and physical evidence; the trial testimony of

---

[1] Where necessary to my examination of the evidence, I have numbered the pages of my copies of the exhibits referred to herein, though the trial record does not reflect my numbering intended solely to help myself organize my thoughts about the evidence and explain to the parties my thinking and analysis.

numerous witnesses; and the written and oral argument of counsel. The evidence addressed the written agreements, multiple instances of pre-closing investigation by the buyers, the disclosures of the sellers, and post-closing events and further post-closing buyer investigation results. I conclude that plaintiffs, the buyers, have failed to prove any basis for holding the defendants, the sellers, liable for the wrongs asserted or monetary damages claimed by the plaintiffs.

## III

### THE PURCHASE AGREEMENT AND CONTRACT DOCUMENTS

The Deer Creek property (sometimes, the "house" or "home") was built in 1964 and purchased by the Barkers in 1984. In 2004, the Deer Creek house was 40 years old, well maintained by the Barkers during the time they lived in the house with their daughters (Ex. 38; Ex. 77, pgs. 1-6), and functioning as a safe and comfortable environment. (Ex. 105; James and Jeanne Barker testimony) The Barkers listed their family home at 26406 Deer Creek Lane for sale in September 2004 through their real estate agent, Neil Weichel of RE/MAX of Valencia.

The Hurrells retained Monica Barkley (who also was an agent in the RE/MAX of Valencia office) as their real estate agent in connection with their purchase of the Deer Creek house. On September 10, 2004, the Hurrells and the Barkers entered into a written "Residential Purchase Agreement and Joint Escrow Instructions" (the "Purchase Agreement"). (Ex. 1) Pertinent provisions of the Purchase Agreement and other related contract documents that were exchanged between the parties ("Contract Documents") are set forth below, including significant warnings and admonitions directed toward the Hurrells, as buyers, and obligations that were imposed on the Barkers, as sellers.

**Buyers' obligations.** The buyers' obligations under the Purchase Agreement and Contract Documents pertinent to this dispute are summarized here and are quoted verbatim from the trial exhibits referenced below. The paragraphing, capitalization, boldface type and italics are as set forth in the trial exhibits.

In the Purchase Agreement and Contract Documents, the Hurrells were notified as follows:

### 7. CONDITIONS AFFECTING PROPERTY: (Ex. 1, pgs. 4-6)

**A.** Unless otherwise agreed: **(i) the property is sold (a) in its PRESENT physical condition as of the date of Acceptance and (b) subject to Buyer's investigation rights.**

* * *

### 9. BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:

**A.** Buyer's acceptance of the condition of, and any other matter affecting the Property, is a contingency of this Agreement as specified in this paragraph and paragraph 14. Within the time specified in paragraph 14, Buyer shall have the right, at Buyer's expense, unless otherwise agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations"), including, but not limited to, the right to: . . . (ii) inspect for wood destroying pests and organisms; . . . (v) satisfy Buyer as to any matter specified in the attached Buyer's Inspection Advisory.

**B.** Buyer shall complete Buyer Investigations and, as specified in paragraph 14, remove the contingency or cancel this Agreement.

* * *

### 14. TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: . . . .

* * *

**B(1)  BUYER HAS: 17 Days** After Acceptance, unless otherwise agreed to in writing, to: (1) complete all Buyer investigations: approve all disclosures, reports and other applicable information, which Buyer receives from Seller; . . . .

### C. CONTINUATION OF CONTINGENCY OR CONTRACTUAL OBLIGATION; SELLER RIGHT TO CANCEL:

* * *

**(2)** . . . Even after the expiration of the time specified in 14(B)(1), Buyer retains the right to make requests to Seller, remove in writing the applicable contingency or cancel this Agreement . . .

.

\* \* \*

### D. EFFECT OF BUYER'S REMOVAL OF CONTINGENCIES:

If Buyer removes, in writing, any contingency or cancellation rights . . . Buyer shall conclusively be deemed to have: (i) completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; (ii) elected to proceed with the transaction; and (iii) assumed all liability, responsibility and expense for Repairs or corrections pertaining to that contingency or cancellation right . . . .

\* \* \*

**15. FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final inspection of the Property within **5 Days** Prior to Close Of Escrow, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm: (i) the Property is maintained pursuant to paragraph 7A; (ii) Repairs have been completed as agreed; and (iii) Seller has complied with Seller's other obligations under this Agreement.

\* \* \*

**BUYER'S INSPECTION ADVISORY** (Ex. 1, pgs. 9-10)
Property Address: <u>26406 Deer Creek ("Property")</u>

**A. IMPORTANCE OF PROPERTY INVESTIGATION:** The physical condition of the land and improvements being purchased is not guaranteed by either Seller or Brokers. For this reason, you should conduct thorough investigations of the Property personally and with professionals who should provide written reports of their investigations. . . . If the professionals recommend further investigations, including a recommendation by a pest control operator to inspect inaccessible areas of the Property, you should contact qualified experts to conduct such additional investigations.

**B. BUYER RIGHTS AND DUTIES:** You have an affirmative duty to exercise reasonable care to protect yourself, including discovery of the legal, practical and technical implications of disclosed facts, and the investigation and verification of information and facts that you know or that are within your diligent attention and observation. The purchase agreement gives you the right to investigate the Property. If you exercise this right, and you should, you must do so in accordance with the terms of that agreement. This is the best way for you to protect yourself. It is extremely important for you to read all written reports provided by professionals and to discuss the results of inspections with the professional who conducted the inspection. You have the right to

request that Seller make repairs, corrections or take other action based upon items discovered in your investigations or disclosed by Seller. If Seller is unwilling or unable to satisfy your requests or you do not want to purchase the Property in its disclosed and discovered condition, you have the right to cancel the agreement if you act within specific time periods. If you do not cancel the agreement in a timely and proper manner, you may be in breach of contract.

**C. SELLER RIGHTS AND DUTIES:** . . . Seller may not be aware of some Property defects or conditions. Seller does not have an obligation to inspect the Property for your benefit nor is Seller obligated to repair, correct or otherwise cure known defects that are disclosed to you or previously unknown defects that are discovered by you or your inspectors during escrow.

\* \* \*

**E. YOU ARE ADVISED TO CONDUCT INVESTIGATIONS OF THE ENTIRE PROPERTY, INCLUDING BUT NOT LIMITED TO THE FOLLOWING:**

\* \* \*

**(1) GENERAL CONDITION OF THE PROPERTY, ITS SYSTEMS AND COMPONENTS:** Foundation, roof, plumbing, heating, air conditioning, electrical, mechanical, security, pool/spa, other structural and non-structural systems and components, fixtures, built-in appliances, any personal property included in the sale, and energy efficiency of the Property. (Structural engineers are best suited to determine possible design or construction defects, and whether improvements are structurally sound.)

\* \* \*

**(3) WOOD DESTROYING PESTS:** Presence of, or conditions likely to lead to the presence of wood destroying pests and organisms and other infestation or infection. Inspection reports covering these items can be separated into two sections: Section 1 identifies areas where infestation or infection is evident. Section 2 identifies areas where there are conditions likely to lead to infestation or infection. A registered structural pest control company is best suited to perform these inspections.

\* \* \*

**(5) ROOF:** Present condition, age, leaks, and remaining useful life. (Roofing contractors are best suited to determine these conditions).

\* \* \*

(7) **WASTE DISPOSAL:** Type, size, adequacy, capacity and condition of sewer and septic systems and components, connection to sewer, and applicable fees.

\* \* \*

(9) **ENVIRONMENTAL HAZARDS:** Potential environmental hazards, including but not limited to, asbestos . . . and other substances, materials, products, or conditions (including mold (airborne, toxic or otherwise), fungus or similar contaminants). . . .

\* \* \*

**Transfer Disclosure Statement** (Ex. 3, pg. 4)

**General Disclosures**

**7. Home Protection Plans:** Buyer(s) are aware that the Standard Buyers Home Protection Plan generally does not include coverage for air conditioning, pool, spa, and other optional coverage. It is recommended that the Buyer(s) and Seller(s) specify exactly what coverage is being included if the purchase of a policy is part of this sale. Buyer(s) and Seller(s) acknowledge that although Broker(s) may provide names and supply literature on the availability of these plans, the selection of the individual plan is at the sole discretion of Buyer(s) and Seller(s). Buyer(s) . . . are advised to make their own investigation as to the exact coverage and what limitations and exclusions individual policies contain. . . .

\* \* \*

**15. Roof Inspections:** . . . .Roofs may leak for various reasons, including but not limited to, damage, age, disrepair, wind, rain, sun, and other elements, improper maintenance or construction. Buyer(s) are advised to obtain a professional roof inspection, at Buyer's expense, within the Buyer's physical investigation contingency period.

**Santa Clarita Valley Disclosures** (Ex. 3, pg. 5)

**13. Plumbing Disclosures:**

**a. Galvanized Pipe Disclosure:** Several Santa Clarita Valley builders have been the targets of class-action lawsuits alleging that they used inferior galvanized steel water pipes that have started to corrode and leak years after the homes were built. Corrosion or damage to water pipes may not be discoverable by Buyer(s) or Broker's visual inspection. Inspection by licensed qualified professionals is strongly recommended to determine the

integrity of the plumbing system prior to the expiration of the
inspection contingency period of the purchase contract. . . .

* * *

### III. [SELLER'S] AGENT'S INSPECTION DISCLOSURE
(Ex. 3, pg. 16, first para.)

(First paragraph)  Agent notes the following items: See exterior
stucco cracks . . . seller states that septic/pump system can back up
. . . recommend a physical inspection by a licensed professional. . .
.

### IV.   [BUYER'S] AGENT'S INSPECTION DISCLOSURE

(Ex. 3, pg. 16, second para.)

. . . No permits on laundry rm or back bedroom [no. 5]. . . .

**Mold disclosure.**  A "Mold Disclosure" (Ex. 9, which is also in evidence as Ex. 3, pg.
17) is attached hereto and incorporated by reference as Appendix A to this memorandum.  The
Mold Disclosure signed by the Hurrells and the Barkers alerted both parties in significant ways.
The disclosure warns the Hurrells of several important matters, including: how mold growth
develops; what kind of damage mold can cause; possible resultant health problems; and how to
assess the presence of or risks associated with mold.  Both buyers and sellers were advised to
hire independent experts for sampling and analysis by a qualified laboratory and to use their
resources to check for the possibility of mold regarding the property in order to satisfy any and
all "concerns."  The disclosure states that "buyer holds sellers [and others] harmless from any
further obligations regarding this matter."

**Sellers' obligations.**  The Purchase Agreement and related Contract Documents created
and discussed the rights and obligations of the Barkers, as sellers, as disputed in this
nondischargeability suit.  The Barkers' disclosure obligations under the Purchase Agreement
and related Contract Documents are found in "The Seller Advisory," dated September 7, 2004
(Ex. 74), extracts of which as pertinent to this dispute are quoted verbatim as follows:

### 2. DISCLOSURES:

**A. General Disclosure Duties:** You must affirmatively
disclose to the buyer, in writing, any and all known facts that

materially affect the value or desirability of your Property. You
must disclose these facts whether or not asked . . . .

### B. Statutory Duties

(1) You must timely prepare and deliver to the buyer . . . a
Real Estate Transfer Disclosure Statement ("TDS") . . . . You have
an obligation to honestly and completely fill out the TDS form in
its entirety.

**Purchase agreement.**  The September 10, 2004 Purchase Agreement  imposed the

following duties on the Barkers, as sellers:

### 4. ALLOCATION OF COSTS (Ex. 1, pgs. 3-6)

### A.  WOOD DESTROYING PEST INSPECTION

(1) Seller shall pay for an inspection and report for wood
destroying pests and organisms ("Report") which shall be prepared
by "sellers choice," a registered structural pest control company.
The report shall cover the accessible areas of the main building and
attached structures and, if checked: detached garages and carports,
detached decks . . . .

* * *

### B.  OTHER INSPECTIONS AND REPORTS

(1)  Seller shall pay to have septic or private sewage
disposal systems inspected "& certified."

* * *

### E.  OTHER COSTS:

* * *

(5) Seller shall pay the cost, not to exceed "$600" of a one-
year home warranty plan . . . .

* * *

### 7. CONDITIONS AFFECTING PROPERTY:

* * *

### B.  SELLER SHALL, within the time specified in paragraph 14, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS AFFECTING THE PROPERTY, including known insurance claims within the past five years, AND MAKE OTHER DISCLOSURES REQUIRED BY THE LAW.

\* \* \*

**D.  NOTE TO SELLER: Buyer has the right to inspect the Property and, as specified in paragraph 14, based upon information discovered in those inspections: (i) cancel this Agreement; or (ii) request that you make Repairs or take other action.**

\* \* \*

## 9.  BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:

\* \* \*

**B** . . . Seller shall make the Property available for all Buyer's investigations.  Seller shall have water, gas, electricity and all operable pilot lights on for Buyer's investigations and through the date possession is made available to Buyer.

\* \* \*

## 14.  TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: . . .

**(A) SELLER HAS: 7 Days** After Acceptance to deliver to Buyer all reports, disclosures and information for which Seller is responsible . . . .

\* \* \*

**B(2)** Within the time specified, Buyer may request that Seller make repairs or take any other action regarding the Property. Seller has no obligation to agree to or respond to Buyer's requests.

\* \* \*

## BUYER'S INSPECTION ADVISORY (Ex. 1, pgs. 9-10)

C.  **SELLER RIGHTS AND DUTIES:** Seller is required to disclose to you material facts known to him/her that affect the value or desirability of the Property. . . . The purchase agreement obligates Seller to make the Property available to you for investigators.

**Transfer disclosure statement.**  The September 13, 2004 "Transfer Disclosure Statement" at Exhibit 3, page 2 asked the Barkers to answer several questions, including:

**7. Are you aware of any of the following items regarding water intrusion, mold, or similar issues?**

*a)  Current or previous problems including, without limitation, any of the following:*

- 10 -

Leaks
Drainage
Overflow
Spills
Mold
System Malfunctions
Anything Else

"Leaks" was answered "Yes" by the Barkers. All other questions and items were answered "No" by the Barkers.

> **10. If the answer to questions 1 to 8 above was YES,** *please attach the Addendum to the Santa Clarita Valley Disclosure and respond to each question . . . .*

Paragraph 3 of the "General Disclosures" portion of Exhibit 3, page 3 of the Transfer Disclosure Statement, stated the following:

> **3. FLOORING DISCLOSURE:** . . . SELLER(S) ARE REQUIRED TO DISCLOSE ANY KNOWN CONDITIONS REGARDING FLOORING UNDERNEATH THE EXISTING FLOOR COVERING. . . .

The Transfer Disclosure Statement, Exhibit 3, stated on page 15,

> **B.** Are you (Seller) aware of any significant defects/malfunctions in any of the following? [Answer by Barkers:] "No."

Interior Walls
Ceilings
Floors
Exterior Walls
Roof(s)
Windows
Foundation
Slab(s)
Plumbing/Sewers/Septics

> **C.** Are you (Seller) aware of any of the following:

> 1. Substances, materials, or products which may be an environmental hazard such as, but not limited to, asbestos, . . . mold . . . and contaminated soil or water on the subject property.

> [The Barkers answered "No" in Exhibit 3, page 15.]

**Mold disclosure.** The Mold Disclosure (Appendix A) said:

> . . . AS WITH ALL KNOWN DEFECTS, SELLERS ARE TO
> ADVISE BUYERS OF ANY "KNOWN" WATER LEAKS,
> SEEPAGES, AND WATER INTRUSIONS IN AND TO THE
> PROPERTY.

In their response required by the Contract Documents, the Barkers disclosed a 1990
washing machine broken hose water calamity and insurance claim (Ex. 3, pgs. 2 and 17; Ex. 9).
They furnished the Hurrells with a required Termite Report (Ex. 1, pg. 3, para. 4A(1), and pg.
9). They furnished the Hurrells with a Septic Certification (per Ex. 1, pg. 3, para. 4B(1); Ex.
103), as outlined above.

**The septic system.** The Myers Pumping Co. Septic Certification was furnished by the
Barkers to the Hurrells on October 2, 2004 (Ex. 103), as required by the Purchase Agreement.
(Ex. 1, pg. 3, para. 4B). The Myers certification is attached as Appendix B to this
memorandum and is summarized here:

> **Myers Pumping Co. Septic Certification. Date: 10-2-04**
>
> **Condition:** Septic tank appears to be in good condition at this date
> of inspection.
>
> **Special notes:** The water level in the tank was at the very top
> which is approx. two feet higher than normal. While pumping the
> tank we experienced large amounts of water backflowing into the
> tank approx. eight hundred gallons & after a while the water finally
> stopped.
>
> **Certification work completed**
>
> Pump & inspect primary compartment <u>X</u>
>
> * * *
>
> There is no further guarantee of the working condition of any
> septic system due to the fact that proper drainage for cesspools &
> leach lines vary from time to time due to: { Weather conditions,
> Non satisfactory soil, & how many people are living in the house }
> This certification is for the septic tank only & does not include
> cesspools or leach lines.

**This system complies with local regulations, L.A. Co. Health Dept. License #00072.**

This septic tank is connected to an electric pump which when the level becomes too high can be turned on manually for one – two hours & divert to an additional leach field in the back yard.

I would recommend talking with the property owner to learn more about how to use this pump system & how often it will be needed.

Being that the pump is operated manually rather than automatic it is possible that water could back up in the house if not used properly.

The Barkers certified to the Hurrells that they were aware of no "significant defects/malfunctions" in any of the features of their home, including among others, "Walls," "Ceilings," "Floors," "Slabs," "Foundation," "Plumbing/Sewers/Septics." (See Ex. 3, pg. 15, especially para. B) This certificate also stated that the Barkers were not aware of any "substances, materials, or products which may be an environmental hazard such as . . . asbestos, . . . mold . . . and contaminated soil or water on the subject property." (Ex. 3, pg. 15, para. C1) The Barkers' certificate also pointed out that the home was built in 1964. (Ex. 3, pg. 15, first introductory para.)

**Termite report.** As required by the Purchase Agreement, the Hurrells were furnished by the Barkers with a written report from a registered structural pest control company that investigated for possible wood destroying pests in or on the property and "conditions likely to lead to the presence of wood destroying pests or organisms" (Ex. 1, pg. 9, para. E), that is, a "Termite Report." It was stipulated at trial that there were no triable issues concerning the Termite Report. The Termite Report was not identified or introduced into evidence. There was no testimony at trial concerning the contents or findings of the Termite Report.

**Warnings to the Hurrells.** The Contract Documents strongly advised the Hurrells to investigate the entire property in order to determine its condition and alerted the Hurrells that the Barkers might not be aware of all defects or other factors affecting the property that the Hurrells might consider to be important. (Ex. 1, pg. 4, para. 7C)

Under the Purchase Agreement, the Hurrells had the right to investigate the Deer Creek house and property before completing their purchase of it (Ex. 1, para. B), though they were restricted from performing "invasive or destructive . . . Investigations . . . without Seller's prior written consent . . . ." (Ex. 1, pg. 4, para. 9A) The Purchase Agreement stated: "Seller has no obligation to agree to or respond to Buyer's requests. (Ex. 1, pg. 6, para. 14(B)(2)) The Hurrells made no such request. (Jeff Hurrell testimony)

Specifically, the Contract Documents advised the Hurrells as follows:

1.    They should conduct a thorough investigation of the Deer Creek property personally and also with professionals from whom they should seek written reports. (Ex. 1, pg. 9, para. A)

2.    They had an affirmative duty to exercise reasonable care to protect themselves, including discovery of the legal, practical and technical implications of the disclosed facts, and the investigation and verification of information and facts that they knew or that were within their diligent attention or observation. (Ex. 1, pg. 9, para. B)

3.    If the Barkers were unwilling or unable to satisfy any Hurrell request for repairs or corrections, or if the Hurrells chose not to purchase the property in either its "disclosed or discovered" condition, then the Hurrells had the right to cancel the Purchase Agreement for a specified period of time. (Ex. 1, pg. 9, para. B)

4.    The Hurrells were explicitly advised to investigate the condition of the foundation, roof, plumbing, heating, air conditioning, electrical, mechanical, pool/spa and other structural and nonstructural systems and components throughout the Deer Creek property. (Ex. 1, pg. 9, para. E)

5.    The Hurrells were advised to obtain a professional roof inspection. (Ex. 3, pg. 4, para. 15)

6.    The Hurrells were advised that several Santa Clarita Valley builders (that is, builders operating in the Deer Creek Lane vicinity) had been the targets of class action lawsuits alleging that they used inferior galvanized steel water pipes that started to corrode and leak years after the homes were built. (Ex. 3, pg. 6, para. 13A) The Hurrells knew that the Deer

Creek house had galvanized steel plumbing (Ex. 105, pg. 14) and were warned that galvanized pipes could lead to problems over time.

7.      The Hurrells were advised that corrosion or damage to water pipes may not be discoverable through the buyer's or the buyer's real estate agent's visual inspection. Inspection by "licensed qualified professionals" was strongly recommended to the Hurrells "to determine the integrity of the plumbing system" prior to the expiration of the inspection contingency period of the Purchase Agreement. (Ex. 3, pg. 6, para. 13A)

8.      The Hurrells were advised that allegations had recently been made against homes in the Deer Creek neighborhood regarding mold and that "any type of water damage, moisture or damp conditions could result in the growth of mold in a structure or on its contents." (Ex. 3, pg. 17; Ex. 9; Appendix A)

9.      The Hurrells were advised in the Mold Disclosure that mold spores appear everywhere in nature; that they should hire independent experts to inspect the property for the presence and cause of mold, as well as possible remedies, and to advise them of possible physical or health-related effects; and that they should use their own resources to check for the possibility of mold regarding the property in order to satisfy any and all concerns. (Ex. 3, pg. 17; Ex. 9; Appendix A)

10.     Upon receipt of the Myers Pumping Septic Certification (Ex. 103; Appendix B), Jeff Hurrell met with Myer's Mark Peterson to discuss specific reservations and limitations in the certification, prior to the Hurrells' removal of "buyers' contingencies" to the Purchase Agreement.  Peterson told Jeff Hurrell at that time that the system was "marginal" and "will require some costly repairs or replacement in the near future." (Ex. 108)

## IV

## THE HURRELLS' INVESTIGATION

Jeff Hurrell hired a home inspection service company, Accomplished Home Inspection Services, Inc., to inspect the Deer Creek property.  (Ex. 105, pgs. 1-2)  The name of the inspector was Darrell Brassfield.  The inspector and his company were recommended to the Hurrells by their real estate agent, Monica Barkley.  Brassfield was accompanied during his

September 2004 home inspection by Jeff Hurrell and Hurrell's real estate agent, Monica Barkley.

When Jeff Hurrell accompanied Brassfield on Brassfield's inspection, Hurrell took numerous photographs of various rooms in the home as well as the exterior of the property. (See, e.g., Ex. 77, pages 1-6, 12) Brassfield also took photographs. (Ex. 105, pgs. 17-24) The Barkers were not present at any time during the Hurrell/Brassfield inspection of the home, and the Barkers provided the Hurrells with complete, unobstructed access to the entire house and property to conduct the September 2004 inspection and several later Hurrell inspections of the property.

Within one week of the September home inspection, Jeff Hurrell received Brassfield's written, detailed home inspection report from Accomplished Home Inspection Services, which I will refer to as the "Brassfield Report." (Jeff Hurrell testimony and Ex. 105) The Brassfield Report stated that the inspection did not include any destructive or disruptive testing, and it did not include the lifting of carpets or flooring, removal of ceiling panels, insulation or vapor barriers, or other similar activities. (Ex. 105, pg. 3)

The Brassfield Report told the Hurrells that the condition of the drainage away from the building was "good" (Ex. 105, pg. 6); the overall condition of the kitchen was "good" (Ex. 105, pg. 11); the overall condition of the three bathrooms was "good" (Ex. 105, pg. 12); the condition of the roof was "good" (Ex. 105, pg. 8); exposed plumbing systems were checked for water leaks and none were found by Brassfield (Ex. 105, pg. 14); the flooring in the laundry area was "good" (Ex. 105, pg. 10); and the Hurrells were advised by Brassfield to install gutters and down spouts that the house did not have (Ex. 105, pg. 9). Brassfield did not comment on any problems or cracks in the kitchen floor. (Ex. 105, pg. 11) The Brassfield Report advised the Hurrells that there were cracks in the concrete chimney crown that needed to be sealed or replaced. (Ex. 105, pg. 7) Brassfield did not report that he saw or smelled mold in the house. Brassfield did not comment on any evidence of mold in his September 2004 oral comments or written report to the Hurrells. (Jeff Hurrell testimony; Ex. 118, pg. 4, lines 4-8)

The Hurrells contend that Brassfield failed to tell them about evidence [he should have seen] of water leaks and related water damage, mold, roof leaks, and cracks in the foundation.

(Ex. 118, pgs. 3-4)  The Brassfield Report warned them of the difficulty of "detecting all but the most severe case of cracking . . . or settlement" in the slab foundation when floor covering is present (Ex. 105, pg. 5) unless some kind of destructive testing is conducted.  No such testing was conducted by the Barkers or, during escrow, by the Hurrells, or by Brassfield, the Hurrells' home inspector.  (Ex. 105, pg. 3)  The Hurrells had a contractual right to request permission to do additional testing (Ex. 1, pg 4, para 9A), but the Hurrells never made such a request to the Barkers.  (Jeff Hurrell testimony)

The Hurrells claimed in their state court lawsuit that was filed before this one that there was visible evidence of prior water damage in the home in "multiple locations" that existed on September 17, 2004 (Ex. 118, pg. 3, lines 1-7; Ex. 119, pg. 5, line 18 to pg. 6, line 4), and they were aware that there was evidence of a possible roof leak.  (Ex. 75)  Prior to close of escrow, Jeff Hurrell knew of and photographed what he described in his trial testimony as a ceiling and wall stain in the living and/or family room (Ex. 38); and Jeff Hurrell was aware of a water heater leak (Ex. 75).

The Brassfield Report opined that all slabs [such as that forming the foundation of the Deer Creek house] experience some degree of cracking due to shrinkage in the drying process (Ex. 105, pg. 6) and that the home's foundation had minor cracking.    Jeff Hurrell acknowledged in his trial testimony that prior to close of escrow there was visible evidence that the Deer Creek house had cracks in the slab foundation.  (See also, Ex. 118, pg. 3, lines 8-9)

The Hurrells also were advised by the Brassfield Report that the overall condition of the plumbing system was "fair" but that repairs were needed (Ex. 105, pg. 14); that there was galvanized piping in the Deer Creek home; and that galvanized piping could lead to problems over time.  (Ex. 105, pg. 14)  They had been advised in the Transfer Disclosure Statement (Ex. 3, pg. 5) that "[local] builders have been the targets of class-action lawsuits alleging that they used inferior galvanized steel water pipes that have started to corrode and leak years after homes were built" and that they should have the "integrity of the plumbing system" inspected by "licensed qualified professionals" "prior to the expiration of the inspection contingency period of the purchase contract."

In response, Jeff Hurrell promptly reviewed the Brassfield Report with a licensed contractor he hired. Hurrell apparently obtained an estimate from the contractor telling Hurrell how much it would cost to make necessary repairs. Hurrell discussed these concerns in his early October 2004 letter, Exhibit 106, page 1, prior to removal of the Hurrells' contingencies under the Purchase Agreement. Jeff Hurrell did not identify the contractor by name.

Hurrell also hired a plumber, Duane Murphy, before the close of escrow and arranged to have Murphy replace the galvanized plumbing in the home immediately after escrow closed (Jeff Hurrell trial testimony), though the Hurrells provided no testimony and introduced no written evidence concerning either (1) Murphy's findings, comments or recommendations to Jeff Hurrell regarding the condition of the home's galvanized pipes or (2) any observable or suspected leaks, moisture, seepage or water intrusion in the house resulting from the pipes' condition before Murphy replaced the galvanized pipes with copper piping.

Jeff Hurrell knew prior to close of escrow that the house had many issues that were not in compliance with building and safety standards (Ex. 106); that it would be necessary to have some asbestos removed from the ceilings and air ducts (Ex. 106); that there were numerous defects in the house and surrounding property that he would inherit if they were not resolved (Ex. 108); and that he was taking on the risk of certain defects in the house and property that would cost him money after he moved in (Ex. 108).

During the entire escrow process, as well as prior thereto, sandbags surrounded the septic pump. Prior to close of escrow, Jeff Hurrell requested an additional inspection of the septic system and was advised by his real estate agent, Monica Barkley, that any system malfunction would be covered by the home protection program that the Barkers agreed in the Purchase Agreement to provide for the benefit of the Hurrells. (Ex. 117, pg. 7, lines 15-17) There was no further pre-closing inspection of the septic system by the Hurrells.

Prior to close of escrow and removal of all contingencies, Jeff Hurrell put a significant amount of time and money into conducting his due diligence investigation of his decision to purchase the house. (Ex. 108) Although the Hurrells extensively inspected the Deer Creek property prior to close of escrow and their removal of all contingencies (Ex. 109), the Hurrells did not hire independent experts to investigate the property for mold, did not obtain a

professional roof inspection, and Jeff Hurrell acknowledged at trial that he had not hired any licensed qualified professionals "to determine the integrity of the plumbing system prior to the expiration of the contingency period of the purchase contract," in spite of written warnings to do so in the Contract Documents.

The Hurrells in this case were accorded 12 extra days to sign and transmit their contingency removal to the Barkers in order to satisfy all concerns the Hurrells might have had under the Purchase Agreement.  The Hurrells removed "any and all contingencies" to their Purchase Agreement in writing on October 9, 2004.  (Ex. 109)

The Hurrells agreed to hold the Barkers harmless against any further obligation regarding mold (Ex. 3, pg. 17), other than the Barkers' obligation to advise the Hurrells of any "known" water leaks, seepages and water intrusions.  (Ex. 3, para. 17, next to last paragraph)

The Hurrells acknowledged that they were purchasing the Deer Creek house in its physical condition as of September 10, 2004, the date of their acceptance of the Purchase Agreement.  (Ex. 1, pg. 6, para. 7A)  The Barkers never represented to the Hurrells that the Deer Creek home was in good condition or that the home was new.  Rather, James Barker stated rather candidly in his October 1 reply to Hurrell's September 30 letter (Ex. 106) that the home was 40 years old, was "country living" and will never be a new house.  (Ex. 93. pg. 1; Ex. 107)

The Hurrells and Brassfield observed discoloration in the "exercise room" back wall and ceiling.  The exercise room is described as the "craft room" in Exhibit 12.  Jeff Hurrell and Brassfield photographed the ceiling and wall stain.  (Ex. 77, pg. 12; Ex. 105, pg. 20)  Jeff Hurrell concluded that the ceiling stain must be the result of new water damage and that it appeared to be damp.  (Ex. 75)  James Barker responded to Exhibit 75 by way of Exhibit 6. The Barkers did not know what caused the staining between the ceilings and the wall but answered the Hurrells in Exhibit 6 that the staining was from an unknown cause, was not damp to the touch and had been stable for a considerable period of time.  The Hurrells accepted the Barkers' response prior to the close of escrow.  (Ex. 76)

Jeff Hurrell read and reviewed the Purchase Agreement (Ex. 1).  He read and reviewed the Mold Disclosure statement (Ex. 9; Ex. 3, pg. 17) and relied on his own due diligence

investigations before he decided to complete the purchase of the Barker home. The Barkers never had any conversations, discussions or communications with Monica Barkley, the real estate agent for the Hurrells. The Hurrells and the Barkers never met or had any oral communications or discussions during the formation of the Purchase Agreement or at any time during escrow. The Barkers never talked with Brassfield. The Barkers were not involved in the selection or hiring of Brassfield or Accomplished Home Inspection by the Hurrells. Jeff Hurrell never asked anyone for the Barkers' telephone number during the home purchase process. He never asked to speak personally with the Barkers during the home purchase process and did not do so at any time. Escrow closed on November 10, 2004. (Ex. 8)

## V

## THE HURRELLS' CLAIMS AND THE BARKERS' RESPONSIVE EVIDENCE

After the close of escrow, when Jeff Hurrell tore down the interior of the house, he found more problems that were not previously apparent to the naked eye. The Hurrells assert in this lawsuit that the Barkers failed to disclose many material defects affecting the Deer Creek property that they assert the Barkers either knew about or should have known about. The following outlines and discusses the defects and nondisclosures for which the Hurrells now seek to recover.

**Slab foundation.** The Hurrells claim that the Barkers failed to disclose defects in the slab foundation, though Brassfield told the Hurrells that it is not unusual for a 40-year old house to have cracks in the foundation, particularly in Southern California where there is a considerable amount of earth movement and earthquakes are frequent. (Ex. 105, pg. 6) The crack in the concrete slab under the kitchen floor was underneath a permanent vinyl floor covering, and while it is possible to infer that the Barkers may have been aware of it, there was no persuasive evidence that the Barkers ever had been made aware of it. Any floor covering had to be removed before an observer could see any crack in the concrete slab. Other than on one occasion—discussed later in my analysis of the Werth testimony—a crack in the slab under the kitchen floor only was noticed post-closing, after Symonds, a contractor hired by the Hurrells, removed the vinyl floor covering.

The Barkers may have seen a crack in the corner of the slab under the floor of their older daughter's bedroom (bedroom no. 2, as per the trial testimony, and Ex. 12) in the Northeast corner of the house in May 2004 when they personally replaced the carpeting in that room with wood laminate flooring. However, the crack was narrow and small, and I saw no material or relevant evidence of moisture, seepage, water stains, water intrusion or mold associated with the Northeast corner of the house where the crack was found. (See, for example, Ex. 78, pg. 28, a 2005 Symonds photograph of the crack in the slab foundation) The Hurrells introduced another photograph (Ex. 35) taken much later, perhaps in 2006, and after considerable remodeling and re-grading work. According to Jeff Hurrell's testimony, his 2006 photograph showed water seepage, but there was no persuasive evidence tying the 2006 water seepage through the crack to physical conditions existing at the time of sale or the time when the Barkers replaced the floor covering in May 2004. It is plausible that the Barkers may have seen the narrow crack when they replaced the existing carpeting in that bedroom, in spite of their lack of any recollection of that fact, but that the crack appeared to be of no significance as they completed their floor work. There was no evidence to explain the source of the water in the 2006 Hurrell photograph. The Barkers had no notice or knowledge of any water intrusion or damage in the Northeastern bedroom, and there was no convincing physical or photographic evidence of any such intrusion or damage that may have existed in 2004.

When the Barkers purchased the home in 1984, during their 1984 purchase escrow, the Barkers noticed and were advised of work by their sellers to repair a pipe buried six feet under the kitchen floor. (James Barker testimony) Prior to the close of the 1984 escrow, the pipe repair work was completed under the kitchen floor. The sellers to the Barkers paid for the cost of the 1984 pipe problem, which was a blocked pipe, not a water leak. (James Barker testimony)

Since the close of the 1984 escrow, the Barkers never observed or created any hole in the kitchen floor. They replaced the vinyl floor covering twice, once in 1984 and once in 1990 (James Barker testimony), but there is no convincing evidence to describe who did the floor covering replacement work or to establish what the Barkers may have known or been told about the condition of the underlying slab foundation by the workers who performed the work.

The post-closing, 2005 Symonds photographic evidence showed evidence of an unexplained repair of what appears to be a crack in the kitchen floor. The repaired crack was not apparent during escrow because it was not visible prior to removal of the permanent vinyl flooring. (Ex. 78, pgs. 27, 37, 188, and 342) Richard Werth, an old friend and business partner of James Barker, was subpoenaed by the Hurrells as a witness adverse to the Barkers and testified that he saw a "jackhammered" hole in the Barkers' kitchen floor sometime in the 1980s or 1990s. Werth was vague about the timeframe of his observation and acknowledged that he saw no water at the time. Werth had been an old friend and business partner of James Barker, but the two parted company in 1997, apparently over a private business dispute. Werth has more recently sued James Barker twice and had not visited the Barker home since 1997. In addition, the post-closing, 2005 photographic evidence reveals no evidence of "jackhammering" damage to the slab under the kitchen flooring, though there is evidence in the 2005 photographs of a repaired crack. (Ex. 78, pgs. 342-343) The evidence does not establish when the repair was made or that the Barkers' knew of the existence or the nature of the repair. Werth's testimony was contradicted by the Barkers' testimony that the only remotely related repair occurred during their 1984 escrow and that the repair was completed by the people from whom the Barkers bought their home before the Barkers moved in. On balance, I find the Barkers' testimony about the kitchen floor and the slab underneath to be more persuasive than Werth's testimony because the Barker's testimony appeared to be consistent with the photographic evidence. Further, there was no photographic or other corroborating evidence of a "jackhammered" hole or of repairs to a jackhammered hole in the floor. The Barkers appeared to me to be more credible on the subject, especially given the extensive pretrial investigation and discovery conducted by the Hurrells and the results of cross examination of Werth and the Barkers at trial.

The Hurrells have not proved by a preponderance that the Barkers either knew or intentionally concealed evidence of significant problems with the slab foundation or that any such problem was the proximate cause of harm to the Hurrells.

**Seepage, moisture and water intrusion.**  The Hurrells claim that the Barkers failed to disclose known water intrusion, moisture and seepage but cited only indirect, unpersuasive and inconclusive evidence to support their claims.

The only significant water leak that the Barkers experienced during the 20 years they owned the Deer Creek home occurred in 1990 when a hose to their washing machine broke and caused a flood.  When Jeanne Barker saw the resulting flood, she called her husband at work to get immediate help.  Upon receiving his wife's call, James Barker hurried home to assist his wife by turning off the water and cleaning up the water mess.  The Barkers immediately notified their insurance company, State Farm Insurance, and submitted a claim for water damage.  The claim submitted by the Barkers to State Farm Insurance was approved, the damage was repaired and the Barkers' claim was paid by State Farm.  In their September 2004 disclosures to the Hurrells, the Barkers reported in writing their 1990 State Farm Insurance claim for the laundry-room damage. (Ex. 3, pgs. 2 and 17)

The Hurrells challenged the Barkers' claim in this regard but produced no persuasive contradictory evidence.  Gloria Anguiano, the only witness for State Farm Insurance, was called by the Hurrells to testify.  She never inquired about the State Farm claim retention policy until the day of her testimony, and she acknowledged that she had made only a 20-minute search in State Farm records concerning the 1990 Barker claim.  She was unable to find the claim and was unable to answer any question about the Barkers' 1990 claim or the company's claim retention policy.  She had asked another State Farm employee for information about the Barkers' 18-year old claim, but she received no helpful information in response.  Anguiano's testimony does not persuade me that the Barkers never made the claim they described in their testimony.

Werth, who had been subpoenaed to testify by the Hurrells, had no recollection of the 1990 washing machine flood.  In his disputed testimony, Werth testified about a "jackhammered" hole in the Barkers' kitchen floor but also acknowledged that he never saw any water or water damage at the time.

After consideration of all the evidence related to this subject, I am persuaded that the Barkers told the truth about the 1990 incident and their insurance claim and that the Hurrells

have failed to prove their claims to the contrary persuasively or by a preponderance of the evidence. I am not persuaded by Werth's conflicting testimony. I find that the Barkers were better informed about their home than Werth was and that Werth, however straightforward and cooperative in court, could have been mistaken, especially given the long passage of time and the relatively incidental circumstances under which he observed the problem he testified about.

The Barkers acknowledged that they experienced water accumulation against the planter box outside near the master bedroom of their home on rare occasions after heavy rain, but testified that they never experienced water intrusion into their house as a result. They also testified that they had never experienced an overflow of the brick planter located outside the master bedroom. The Barkers had no knowledge of any leaks from the roof or the walls. On occasion when it rained heavily, the Barkers saw short-term puddles of water in the back yard, but testified that the puddles dried up fairly quickly and that they never experienced rain water or any other water intruding into the home from an outside source at any time. While the Barkers occasionally saw puddles outside the home after heavy rain or lawn sprinkling, they also said the puddles went away within a day or a day and a half.

The Barkers had no knowledge or notice of any seepage or water intrusion into the house at any time during their 20-year residence, with the single exception of the 1990 laundry-room flood. The Barkers were firm and convincing in their testimony that they never saw water intrusion in their home and that if they had observed a water intrusion problem they would have dealt with it at the time and would have disclosed the fact to the Hurrells, much as the Barkers did concerning the 1990 laundry-room flood and insurance claim. I find the Barkers' testimony to be credible and persuasive. The Hurrells failed to prove convincingly that there was any seepage, moisture or water intrusion known to the Barkers affecting the Barker residence other than the fully disclosed 1990 laundry room flood.

The Hurrells contend that prior to close of escrow, the property had water damage and that there was visible evidence of prior water damage in the house. (Ex. 118, pg. 3, lines 1-21) The evidence does not persuade me that the Barkers knew about significant water damage, either inside or outside the house, or that they concealed from the Hurrells any material water damage they knew about.

There was considerable after-the-fact testimony by Hurrell witnesses such as Seiver, Symonds, Bunn and Boeger about the water damage found after demolition and during renovation of the house. Most of the physical evidence referred to, however, had previously been concealed behind finished walls, and there is no persuasive evidence to support a finding that the Barkers knew about such concealed problems in the house in 2004. In addition, the Hurrell evidence tended to be general and speculative; based on observations made after demolition in 2004, 2005 or 2006; and contradicted by myriad pre-closing inspection reports, observations and other testimony, as discussed herein.

There were suggestions in the testimony of the Hurrells' expert witnesses such as: (1) water damage could only have occurred after repeated "wet/dry cycles;" (2) "moisture smells;" (3) "usually the homeowner knows;" (4) "double tacking strips under carpet are indicative of a long-standing problem;" and (5) "nobody would have installed a carpet under such conditions without informing the customer." While this testimony may have been of some guidance, there was no evidence to establish that any of it was relevant to the Barkers' experience with the house. The stronger, more persuasive evidence proved just the opposite as will be discussed later.

In January 2006, long after closing, two intervening rainy seasons and considerable demolition, Michael Boeger examined the now long-demolished interior of the home and commented at trial that there were problems that included "water intrusion from migration under the slab foundation," "water wicking up" and "capillary action." Boeger expressed the opinion that these events affected the lower interior walls of the house. While that may have been true, there is no persuasive evidence to prove by a preponderance that the Barkers, or either of them, knew such conditions existed while they lived in the house. On balance, I conclude that they did not. What the evidence showed was: (1) the Barkers testified that they often walked barefoot on the carpet and never felt any dampness or smelled strange odors; (2) Brassfield did not find seepage or moisture problems and did not smell strange odors on September 17, 2004; and (3) the Hurrells, who inspected the home themselves on three occasions during the September through November 2004 period, observed no problems such as moisture, water intrusion or strange odors. Monica Barkley, the Hurrells' real estate agent, did

not observe or report any evidence of water intrusion, moisture, seepage, odors, mold or cracks in the foundation in the disclosure report she was required by the Purchase Agreement to provide to the Hurrells. (Ex. 117, pg. 7, lines 22-24)

Boeger, a Hurrell expert witness, in January 2006 noticed water stains that he determined to be about six months to one year in age—that is, occurring after the Hurrells owned the home.  Boeger's testimony seems to me to be too remote from the 2004 home purchase transaction to be useful.

It is very unfortunate that the home exhibited such problems after the Hurrells became the owners.  It is clear that the previously unknown and unobserved problems resulted in substantial repair and remediation costs.  Nevertheless, the evidence persuades me it is most likely that during the Barker-Hurrell 2004 sale and escrow period, the problems were hidden behind finished walls, and that nobody, including the Barkers, was aware of mold, dry rot or termite damage lurking behind the walls, under wall-to-wall carpeting or under tile or vinyl finished floors.

According to photographs taken prior to post-closing destructive testing of the Hurrell demolition and renovation work, the house looked to be well-maintained.  The disclosures by the Barkers were not as detailed as they might have been.  On the other hand, the Barkers fully disclosed a major water damage incident that occurred in their laundry room in 1990 and their resulting insurance claim even though they were not required to do so by the Purchase Agreement. The Purchase Agreement (Ex. 1, pg. 4, para. 7B) specifically required the Barkers to disclose insurance claims, but only those occurring "within the past five years."  The Barkers' acknowledged nondisclosures focused on by the Hurrells were minor and apparently of no consequence.  First, toilet backups and overflows were immediately corrected and cleaned up.  There was no water intrusion.  Second, sink leaks were minor, were quickly cleaned up and there was no evidence of any resulting damage.  Third, the shower backups, where water accumulated in the shower pan, occurred only in bathroom number 3, and there never was an overflow from the shower pan.  The backup was minor and was corrected immediately by the Barkers each time by turning on the septic pump, a normal part of the Barkers' operation of their home during their 20-year occupancy.  Most importantly, no Hurrell

expert witness attributed any water seepage or water intrusion to toilet leaks, sink leaks or shower backups in the home.

To attempt to prove otherwise, Jeff Hurrell pointed to two post-closing and post-demolition photographs taken after he removed a bathtub as part of his general demolition and remodeling of a bathroom.  Hurrell testified that the photographs showed "sewage coming up." (Exs. 25 and 26)  First, the photographs do not necessarily lead me to a conclusion that the Barkers are culpable for the concealment of "known facts."  Second, when the Hurrells removed a bathtub from an operating plumbing and sewage system in the process of demolishing or renovating their home without capping the drain pipe, sewage water might have "come up" as a result.  In any event, a demolished bathroom and its consequences are not representative of the finished bathrooms found in the home as purchased by the Hurrells.  The photograph does not convince me of the Barkers' culpability for what most likely was a consequence of post-closing demolition.

Symonds, Hurrells' renovation contractor, testified that he observed rotted tacking strips under removed wall-to-wall carpeting that he believed were indicative of pre-existing damp conditions over a lengthy time period.  The Barkers testified that they often walked barefoot on the carpet and never felt or experienced dampness.  There was no evidence to demonstrate convincingly that the Barkers were aware of the rotted tacking strips; the opposite seems to be the case, and I so find.

Again, the evidence establishes that any "dampness" problem was either nonexistent at the time of the Hurrell purchase or was unknown to the Barkers pre-closing.  While Symonds testified that no carpet installer would have installed carpet over deteriorating tacking strips, the evidence reveals very little information about the carpets other than the date they were installed, 1990.  There was no convincing evidence to establish that anybody was aware of a problem in 1990, ever told the Barkers there was a problem, or that the Barkers knew there was a problem and ignored it for 14 years.  I conclude that the evidence establishes the contrary— that nobody told the Barkers, and they did not know there was a problem.  The Hurrells failed to demonstrate persuasively that the Barkers were aware of and concealed any seepage, moisture or water intrusion.

**Mold and galvanized pipes.**  The Hurrells claim that the Barkers failed to disclose the presence of mold, but the Hurrells have provided no convincing evidence that the Barkers had any reason to suspect a mold problem.

About a week after the close of escrow, Murphy, the Hurrells' plumber, after extensive work on the house post-closing, informed Jeff Hurrell that he had noticed something during his work that he suspected to be mold.  It is entirely plausible and most likely from Hurrell's testimony that Murphy's observations were based on evidence that Murphy uncovered inside the walls of the house—that nobody could see or know about before the plumber did his re-piping work.

The house was known to contain galvanized piping.  This was apparent and noted in the September 17 Brassfield Report.  Jeff Hurrell hired Murphy, a plumber, before closing and had the plumber open up walls and remove galvanized pipes and replace them with copper piping shortly after escrow closed on November 10, 2004.  Murphy did not testify.  Although the Hurrells introduced much debris and rubble from their partially demolished home to prove that mold, dry rot and termite damage existed in the home, they did <u>not</u> introduce the removed galvanized piping into evidence, and it was not mentioned in Jeff Hurrell's hearsay testimony concerning what Murphy observed and reported to Jeff Hurrell.  It is possible that the galvanized pipes were leaking behind the walls.  I infer from the Contract Documents (Ex. 3, pg. 6) and the Brassfield Report (Ex. 105, pgs. 2 and 22) that the Hurrells received strong warnings about the risks of old, leaky galvanized pipes in the house.  The Hurrells' expert testimony also supports an inference and conclusion that it is possible that leaking galvanized piping hidden from the Barkers' observation was the source of the widespread mold that was discovered later.  Otherwise, the evidence is inadequate to determine the precise source of the water or moisture problem that led to the mold, dry rot and termite damage found by Seiver and later witnesses.  Perhaps evidence of leaky galvanized pipes was concealed by Jeff Hurrell because it would have undermined his claims.  The evidence on this subject was within the Hurrells' control but was not produced by the Hurrells.  At the very least, I infer that whatever the evidence might have revealed, it was not helpful to the Hurrells' position, especially in light

of the extensive testimonial, photographic and physical evidence that the Hurrells actually produced at trial.

As a result of Murphy's finding, Jeff Hurrell contacted mold expert Owen Seiver, recommended to him by Monica Barkley, who inspected the house on December 7, 2004 and found mold.

Several features of the house were obvious and apparent to the Hurrells or to any observer from September 9, 2004, through November 10, 2004: (1) spots on several interior walls and ceilings, and on the exterior of the home, though minor; (2) cracks in the foundation slab that were visible from the exterior of the home to the Hurrells and to their home inspector (Exs. 52, and 53, though these photographs were taken after closing) according to Jeff Hurrell's testimony; (3) minor rotting at the end of exposed roof risers, visible to any observer (Ex. 78, pg. 97); (4) sand bags surrounding the septic pump that were evident to any observer throughout the Hurrell purchase transaction and during each pre-closing inspection; and (5) an illegal, but obvious, drain pipe from the master bath to an outside planter, though the Barkers testified that they very rarely used the jacuzzi tub to which the drain pipe led during their 20-year occupancy, perhaps as few as five times overall, and no Hurrell witness ascribed any resulting structural or environmental damage to the existence of the pipe. At the same time, neither the Hurrells nor the Hurrells' inspectors ever inquired or complained of any seepage, moisture or water intrusion problem before the Hurrells removed all their contingencies and concluded their purchase of the home. It is significant that neither the Hurrells nor any of their pre-closing inspectors complained of any unusual conditions or smells suggestive of leaking water, seepage, moisture or mold.

The Hurrells later claimed in their state court lawsuit that they knew of much "visible evidence of water damage [in the home] that existed on September 17, 2004," as follows:

> Plaintiff Jeff Hurrell is informed and believes that the location of visible evidence of prior water damage that existed on September 17, 2004 was as follows:
> a. On the wall behind water heater, at the base of the water heater and on the wall in the garage which backs up to the water heater.
> b. On the ceiling in the living room adjacent to the chimney.

      c.  In the hall closet, west wall, on and by the access panel.

      d.  In two adjacent bedrooms (easternmost bedroom in the front of
           the house and bedroom directly west) on the ceiling.

      e.  Water damage in the office/exercise room (ceiling, south wall,
           east wall and carpeting by east wall).

      f.  Moisture under the flooring in the easternmost bedroom on the
           front of the house.

      g.  Planter outside of the master bathroom.

      h.  In the kitchen above the kitchen window.

      i.  Wall behind the hot water heater.

(Ex. 119, pg. 5, line 18 to pg. 6, line 4)

     If Jeff Hurrell knew these things, I find that there is no justifiable reason why he did not take action of any kind, such as insisting on further inspections and testing or declining to complete his purchase of the home. I further find that no alleged nondisclosure was proved persuasively, was material or that the condition asserted led to significant damage or injury, proved by a preponderance. Put another way, the Hurrells' position throws up a series of insignificant, minor nondisclosures, inflates them by remote, vague and unpersuasive evidence, and leaps to speculative conclusions unsupported by any direct, convincing evidence without proving by a preponderance the Barkers' culpability for any serious damage claim asserted.

     We know the following from the Seiver and Bunn testimony on the Hurrells' behalf: (1) mold can grow quickly under the right conditions—that is, plumbing leaks, moisture or water intrusion; (2) mold can be obvious to the smell; and (3) physically disturbing or altering any mold site can lead to a release of spores and the rapid spread of mold.

     It is reasonable to infer from the evidence that perhaps the galvanized pipes were leaking, though behind closed walls. Perhaps when Murphy, the Hurrells' plumber, cut holes in the walls and removed old, perhaps leaking, pipes and installed new copper piping, the work caused latent or incipient mold to spread. Perhaps the holes in the wall opened the house to new, previously unnoticeable odors resulting from previously concealed mold or other concealed structural or building deterioration occurring behind the otherwise closed walls. Extensive demolition work in early 2005 ordered by the Hurrells certainly exposed the home to

new odors that may not have been present or apparent before the demolition and renovation work began after the Hurrell purchase was complete.

Seiver acknowledged that even with his mold-finding expertise he could not immediately detect mold upon his entry into the home on December 7, 2004. Seiver testified that in order to determine the existence of mold, one must collect samples of suspected mold and then subject the samples to testing under a laboratory microscope by a trained, knowledgeable person such as Seiver.

The foregoing evidence from the trial and the inferences therefrom are not necessarily suggestive of a mold condition that would have been obvious to the Barkers as they lived in the house for 20 years. The Barkers both said they (1) were unaware of mold in the house; (2) had never seen mold; (3) had never smelled mold in the house; and (4) had never experienced wet or damp floors or carpets in the home, with very limited exceptions that the Barkers testified about, such as the 1990 laundry room flood and when they experienced rare toilet overflows or minor sink leaks that they quickly addressed and corrected by drying up the spilled water, plunging the toilets and repairing the sink leaks.

Brassfield, in his report to the Hurrells, observed no unexpected moisture, mold or odors. I infer Brassfield would have commented to Jeff Hurrell so if he had seen it, smelled it or seen troubling conditions suggestive of mold. The absence of any such comment by Brassfield strongly corroborates the Barkers' testimony that they were unaware of mold in the home or of dampness, moisture or odors that might have raised their concerns or alerted them to the presence of mold.

The Hurrells had a contractual right to opt out of their Purchase Agreement if they were not satisfied with the physical condition of the home. They were advised in writing in the Purchase Agreement and Contract Documents to hire their own specialists and have any examination results submitted for testing to a laboratory of their choosing. They did not do so. They never complained or inquired about odors at any time. They took little action in response to any of the early red-flag warnings disclosed to them and their advisors. Nor did they respond to the evidence that they now cite and complain about, which was apparent to them at the time of their Purchase Agreement, inspections and escrow. The Hurrells removed all contingencies

under their Purchase Agreement on October 9, 2004, well after Brassfield's inspection and accompanying detailed report and discussion with Jeff Hurrell, well after receiving Myers' Septic Certification and discussing it with Peterson, and well after Jeff Hurrell wrote to the Barkers about his concerns and had received James Barker's written reply to each inquiry.

The Barkers filed a post-closing, December 2004 claim with their insurance company after notice from Weichel, their real estate agent, that the Hurrells had reported finding mold in the house. Even if the mold problem had been covered by the Barkers' policy, the most the Barkers could have recovered from State Farm was $5,000. (Ex. 89, pg. 3) The claim filed by the Barkers with State Farm in December 2004, after escrow closed, does not establish their awareness of mold in the Deer Creek home prior to close of escrow as the Hurrells contend, but rather simply demonstrates that the Barkers tried to seek help from their insurance company when the presence of mold was reported to them.

After weighing all the evidence, I conclude that the Hurrells have not proved by a preponderance that: (1) the Barkers misrepresented any material fact; (2) the Barkers concealed any material fact; (3) the Barkers intended to deceive the Hurrells; (4) the Hurrells justifiably relied on any material fact misrepresented or concealed by the Barkers; or (5) that the Hurrells' losses were proximately caused by Hurrell-reliance on any material fact misrepresented or concealed by the Barkers. I also conclude that the Hurrells have not proved by a preponderance that prior to the close of escrow the Barkers were aware of the presence, or likely presence, of mold. I conclude that the Barkers appeared to have acted in good faith and innocently, not to deceive the Hurrells. No loss suffered by the Hurrells was proximately caused by any wrongful conduct of the Barkers.

Jeff Symonds, a licensed architect and contractor, inspected the Deer Creek property for the Hurrells starting in March 2005. Symonds conducted destructive testing on the Deer Creek property. Symonds described "destructive testing" as an act "necessary to reveal a defect or problem that one cannot see, a problem that is not obvious without perhaps taking a house apart or removing permanent fixtures or floor coverings, walls, or other permanent installations in a home," or words to that effect. Jeff Hurrell's photographs demonstrate the broad extent of destructive testing that took place after the close of escrow. (Exs. 22, 24, 25, 26, 28, 29, 35,

36, 37, 44, 45, 46, 47, 48, 54 and 58)  Symonds' photographs also demonstrate the extent of destructive testing that took place after the close of escrow, in some cases well after, perhaps as late as 2006.  (Ex. 78, pgs. 4, 18, 26, 27, 37, 49, 61, 69, 98, 165, 188, 199, 200, 202, 230, 274, 277, 281, and 342)

Symonds testified that it was necessary to remove drywall, portions of the ceiling, flooring (including carpet and linoleum), furniture and appliances in order to determine the existence and extent of damage [meaning, I infer, deterioration of materials] behind those items.  (Ex. 78, pgs. 4, 18, 27, 37, 49, 61, 165, 188, and 277; Ex. 82, pg. 81)  Although Symonds testified at length in the trial, he also prepared and submitted an earlier written report to the Hurrells that was not produced or explained in his testimony.

Boeger opined in his testimony on behalf of the Hurrells that one can usually confirm the existence of mold by eyesight or smell, but Boeger did not see the house until 2006, long after extensive demolition, remodeling and mold remediation work had been completed.  I infer from the evidence and take judicial notice that a home in a finished, occupied condition normally smells differently than a home that has been largely demolished and where the framing and other aged building materials have been exposed.  In addition, the evidence established that the Barkers never saw or smelled any mold in their home, other than perhaps mold on bread.  If the Barkers had noticed or seen something in their home that was black or suspicious looking, the evidence, taken in totality, strongly suggests that the Barkers would have taken appropriate remedial action to protect their home, as they did with the 1990 laundry room flood.  Any conclusion that they ignored known risks to the security and the safety of their home over the years and acted to deceive the Hurrells on this subject would be speculative and is not consistent with a reasonable view of the totality of the evidence.

Tonya Bunn, a mold expert, conducted her mold assessment for the Hurrells in July 2005 and found mold, but her written report is formulaic and displays numerous inconsistencies.  (Ex. 15)  Bunn took samples of suspected mold and had them tested, also under a microscope.  None of her testimony alters my conclusion that the Barkers are innocent of any wrongdoing toward the Hurrells.

**Stains and Barker painting.** There was conflicting evidence concerning the Barkers' concealment of stains. On the one hand, Jeanne Barker acknowledged in her testimony that she painted over stains in the house. On the other hand, she also testified that she did not paint to conceal the stains but rather to make her home look nicer and fresher for a buyer. While this evidence could support an inference that Jeanne Barker painted to conceal stains that might be suggestive of water leaks or, worse, mold, there was considerable physical evidence to corroborate a more benign interpretation of Jeanne Barker's motivation.

First of all, Jeff Hurrell cited in his comments and photographs numerous visible examples of stains that were not concealed, around the water heater, on the kitchen cabinet, in the hall closet on the cover panel that was left un-repainted during the entire 20-year Barker occupancy, and others. Secondly, Jeanne Barker purposefully left the paint cans with unused paint in them in the home when she moved out as a convenience to the Hurrells because she thought they might later want to touch up any room that needed it. This physical and photographic evidence strongly supports Jeanne Barker's testimony that she did not paint to conceal stains. In spite of the conflict in the evidence, I conclude that it does not prove by a preponderance an intent to deceive the Hurrells or cause them any harm.

**Septic system, drainage and grading.** The Hurrells claim that the Barkers failed to disclose defects in the septic system.

The Purchase Agreement required a Septic Certification. (Ex. 1, pg. 3, para. 4B) The Barkers furnished the certification. (Ex. 103; Appendix B) The certificate did not give the system a clean bill of health. Jeff Hurrell met with Peterson, the certifier, and was told by Peterson that the [40-year old] system would have to be replaced shortly. In addition, the sandbags placed by the Barkers around the pump were obvious throughout the inspection and escrow period during the Hurrell purchase process. The Hurrells negotiated to obtain a greater septic credit from the Barkers but then accepted the credit the Barkers had previously agreed to give to the Hurrells in consideration of the Hurrells' concerns about the condition of the property. The Hurrells signed off on the system when they removed all contingencies under the Purchase Agreement on October 9, 2004.

The Hurrells contend that during the escrow period, Myers Pumping was aware of material adverse matters that it did not include in its *"certification"* (Ex. 112, pg. 21, para. 86); that based on the representations made by Peterson of Myers Pumping, the Hurrells relied on the Myers Pumping certification (Ex. 112, pg. 22, para. 90); and that Myers Pumping carelessly and negligently certified the system by failing to competently inspect the system, failing to note matters that a competent inspection would have revealed, and [improperly or incompetently] certifying the system.

The Barkers' experience was that if any kind of sewer backup occurred—outside in the system through pipes open to the air, or from heavy rain or because something improper was flushed down the toilet—the normal solution employed by the Barkers during their 20-year residence in the home was to click on a switch on the wall to activate the septic pump for a short while, perhaps 30-60 minutes. The Barkers learned how to operate the system from their neighbors in 1984 when they moved in; they had no prior septic system experience. At the same time, throughout much of the Barkers' period of residence, the septic system was regularly maintained and serviced by Myers Pumping, without significant adverse consequences to the Barkers.

The Barkers acknowledged that occasionally, shower water backed up within the shower pan of the small bathroom near bedroom number 5 (as per the trial testimony and Ex. 12) when they forgot to turn the septic pump on. When this happened, the Barkers turned on the septic pump for a few minutes in order to correct the problem of water in the shower pan. To the Barkers' knowledge, no other corrective action was necessary. At the same time, the Barkers said the shower pan never overflowed at any time. While the Barkers acknowledged occasional minor overflows outside, those overflows were rare and quickly corrected by turning on the septic pump.

The Barkers also testified that the septic system worked; that routine pumping was required as a normal matter and quickly solved any temporary backup in the shower or otherwise; that the system operated satisfactorily during the Barkers' 20-year occupancy and their regular use of the system, requiring periodic pumping by Myers and only two repairs—the replacement of a worn pump on two widely separated occasions. On balance, the evidence

fails to establish that the Barkers hid a material fact from the Hurrells or intended to deceive them or cause them any injury.

The septic system had been installed prior to the Barkers' purchase of the property in 1984, perhaps in 1964 when the house was built, though the testimony was scant about the system's history; some doubt was injected by Tom Hoffman's testimony describing his April 2005 inspection for the Hurrells; nevertheless, the evidence about the history of the system was vague and inconclusive.

In April 2005, about six months after the Hurrells purchased the home, Hoffman, a plumber, determined that the water level in the septic tank was too high and the seepage pit was full and contaminated; however, Hoffman also testified that for a period of at least six months before his inspection, no one operated the septic system. By contrast, the Barkers testified that while they lived in the house they operated the system on a regular basis.

While Hoffman testified that he thought a make-shift gravel pit had been installed by the home's prior owner five to seven years ago, taking into account all the testimony on the subject from Hoffman and the Barkers, I am not persuaded that the Barkers lied or attempted to deceive the Hurrells about the septic system. In my view, the conflicting evidence was weak and inconclusive and insufficient to hold the Barkers liable on a nondischargeable basis.

Hoffman allegedly found a candy wrapper in the system but did not produce the original at the time of trial and could not precisely date the candy wrapper. On balance, I did not find Hoffman's testimony about the candy wrapper and his estimated time frame of repairs to the system to be persuasive.

While Hoffman testified that he found soil in the backyard contaminated by overflows from the upper leach field near the barn, the evidence of Barker-knowledge of septic system "overflows" or "soil contaminated by sewage" is weak and reflects only minor events that do not support the Hurrells' claims. This is so especially in light of the Myers Septic Certification and the opportunity that Jeff Hurrell exercised to question Mark Peterson extensively about the septic system during the contingency period of the Purchase Agreement.

The same can be said of the Hurrells' claims about "drainage" or "grading" problems. So far as the trial evidence reveals, the Barkers lived in their Deer Creek home for 20 years

pretty much "as is," with their repair and maintenance experience fully described in their testimony, including minor trenching by the Barkers in the corral area to divert rain water runoff. The evidence is insufficient to support a finding of "known concealment" or "material misrepresentation" by the Barkers concerning any grading or drainage issue asserted by the Hurrells. The evidence does not establish by a preponderance that the Barkers acted to deceive the Hurrells or to cause injury to the Hurrells or with knowledge that injury to the Hurrells was substantially certain to occur.

The septic system, drainage and grading evidence demonstrates that the Hurrells got what they bargained for. No material misrepresentation or concealment by the Barkers has been proved. No damage or injury to the Hurrells was proximately caused by any conduct of the Barkers. The Hurrells have failed to prove an intent to deceive by the Barkers or justifiable reliance by the Hurrells.

**Roof and dry rotted wood.** The Hurrells claim that the Barkers failed to disclose defects in the roof. The Barkers testified that they had no knowledge or notice that there was a water leak from the roof, any resulting interior water damage or an ongoing problem with the roof. Brassfield found the condition of the roof to be "good" when he inspected it in September 2004. Boeger testified that the roof was approximately 10 to 15 years old when he inspected it in January 2006. This presents a discrepancy in the evidence, but the Barkers' testimony was supported by their roofer's bills dated in 1999 that corroborated the 1999 roof replacement. (Exs. 69, 70, 71 and 72)

In 1999, the Barkers retained Graziano Roofing to install a new roof on their Deer Creek house. (Ex. 69)  The Hurrells claim that the Barkers failed to disclose dry rot near the chimney, although Graziano Roofing had advised the Barkers in 1999 that there was dry rotted wood near the chimney (Ex. 69), and the Barkers immediately agreed to the repair and replacement of the dry rotted wood.

The only dry rot known to the Barkers that I can reasonably infer from the evidence was the minor problem discovered by their roofer in 1999 when replacing the roof. The dry rot was fully repaired at the time as a part of that project. There is no basis in the evidence to find that

the Barkers knew about any other dry rot after the 1999 roof replacement or that the Barkers knew of any dry rot in their home in 2004 at the time of the sale to the Hurrells.

**Termite damage.**   The Hurrells claim that the Barkers failed to disclose termite damage.  The Barkers were not aware and had no knowledge or notice of any evidence to indicate that there was termite damage or any termite issue concerning the house prior to close of escrow.  In addition, the Barkers' longstanding pre-sale practice was to employ frequent preventive professional pest control spraying to avert any potential problems with insects or termites. (Ex. 18)

The Purchase Agreement called for a Termite Report.  The Barkers furnished one.  The Hurrells saw it.  It was stipulated by the Hurrells at trial that they had no issue concerning the Termite Report.  The report itself was not introduced into evidence or discussed in the trial testimony.  In fact, it appears that any termite damage that existed was unknown to everybody, sellers and buyers, until long after the November 2004 closing and extensive demolition of the home by the Hurrells in 2005.   The evidence is insufficient to find any basis for nondischargeability based on termite damage later discovered in the home after the 2005 demolition.

## VI

## CONCLUSIONS

The Hurrells repaired, rebuilt and extensively remodeled the Deer Creek home to their liking after close of escrow (Ex. 82), but they assert that the Barkers should be held liable on a nondischargeable basis for about $650,000 in repair costs, including re-grading the property, septic replacement, and mold, termite, and dry rot remediation and repair, among other charges.

The Hurrells contend that they have spent an excess of $650,000 in home repairs and/or renovations and more than $450,000 in attorney's fees for a minimum total of $1.1 million necessitated solely by what they claimed were defects fraudulently, or willfully and maliciously, concealed from them by the Barkers, who, it is claimed, acted with an intent to injure the Hurrells.  (Ex. 82)

In the process of remodeling the Deer Creek house, the Hurrells installed hardwood floors in three separate rooms although the house had only one bedroom with a hardwood floor prior to the close of escrow. The Hurrells also added approximately 560 square feet of additional square footage of living area and many other improvements. (Ex. 82, pg. 168) The Hurrells claim that they have excluded the "improvement" costs from their damage claim which is based solely on "repair" costs.

The evidence does not establish by a preponderance that either James Barker or Jeanne Barker intended to defraud the Hurrells or conceal any material facts about the house from the Hurrells or acted with an intent, willfully and maliciously, to injure the Hurrells. The Hurrells bear the burden of proving their claim against the Bakers is exempt from discharge under 11 U.S.C. § 523(a)(2)(A) or (a)(6) by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 284 (1991). As to section 523(a)(6), the statute provides:

> (a) A discharge under 727, 1141, 1228(a), 128(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> * * *
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Thus, under § 523(a)(6), the creditor must prove by a preponderance that the debtor's conduct in causing the claimant's injuries was both willful and malicious. Carrillo v. Su (In re Su), 290 F.3d 1140, 1146-47 (9th Cir. 2002). "Willfulness" requires proof that the debtor deliberately or intentionally injured the creditor, and that in doing so, the debtor intended the consequences of his act, not just the act itself. Kawaauhau v. Geiger, 523 U.S. 57, 60-61 (1998). For there to be a "malicious injury," the creditor must prove that the debtor: (1) committed a wrongful act; (2) intentionally; (3) which necessarily caused injury; and (4) without just cause or excuse. Su, 290 F.3d at 1146-47. None of this has been proved.

The Hurrells had a right to full and honest disclosure by the Barkers. I conclude that the Barkers' disclosures were fair and reasonable and satisfied the terms of the Purchase Agreement and Contract Documents. Any nondisclosures were minor and immaterial, concerning toilets, sinks and the shower in bathroom number 3, and rare, short term, minor

septic overflows outside. Moreover, the Hurrells inspected the property extensively, often assisted by professionals. The Hurrells' pre-closing professional advisors included Brassfield and his inspection report; Mark Peterson of Myers Pumping Company and his Septic Certification (Exs. 103, 105, 112, pg. 23, line 24 to pg. 24, line 2); another unidentified contractor; and Hurrell's plumber, Murphy.

While the Hurrells were entitled to full disclosure of any troublesome conditions known to the Barkers about their home, the Hurrells received such disclosures early in the escrow period. I conclude that there was no proof by a preponderance of the evidence of any misrepresentation or fraudulent concealment of any material fact by the Barkers.

The Barker disclosures, as required by the Purchase Agreement and the law, perhaps were not as detailed as they might have been. It is possible to infer from the evidence that the Barkers knew more than they revealed about cracks in the slab foundation, drainage, the possibility of seepage, moisture and lurking problems in their home from their experiences as residents there over a 20-year period.

On balance, I conclude that (1) no material facts were misrepresented or concealed, (2) the Barkers did not act with an intent to deceive or injure the Hurrells, and (3) the Barkers did not actively conceal any material fact known to them with the knowledge that such fact was known and accessible only to them and was not within the reach of the Hurrells' pre-closing investigation rights, the Hurrells' reasonably diligent investigation, or the Hurrells' observation. See Lingsch v. Savage, 213 C.A. 2d 729, 736 (1963). In so concluding, I have taken into account all the elements of the Purchase Agreement and the rights and obligations of both parties to the agreement. I have also taken into account the fact that there were several "red flags" [as discussed in the Purchase Agreement and the Brassfield Report] that were equally apparent to Jeff Hurrell and his chosen professionals as they evaluated the conditions and risks inherent in the Hurrells' acquisition of the house (a) at the time of the Purchase Agreement, (b) during the Purchase Agreement contingency period, and (c) during the remainder of the escrow period before the November 10, 2004 closing.

Here, the Hurrells had ample, unrestricted opportunity to investigate and pursue answers to any question concerning the condition of the home that might have been a concern to them.

In fact, once they owned the home, they quickly uncovered serious problems using scant additional professional help and at modest expense. The Hurrells hired their plumber, Murphy, pre-closing. Four weeks after closing on their purchase, they hired an environmental expert, Seiver, to conduct an inspection at a total cost of just $590. After careful consideration and a balancing of all the evidence, I conclude that Jeff Hurrell may have had a number of concerns prior to closing that he failed to investigate adequately, commencing with the Hurrells' first visit to the home on September 9, 2004, during the physical contingency period of their Purchase Agreement, and prior to the closing of the Hurrell purchase on November 10, 2004. At the same time there is no evidence in the record, other than long-after-the-fact evidence [much of it produced after extensive destructive testing and partial demolition of the house] suggesting that <u>perhaps</u> the Barkers knew and <u>maybe</u> failed to comment on conditions that <u>should have been</u> obvious to any observer, conditions which <u>might</u> have revealed problems lurking behind finished walls and under permanent floor coverings that had been in place for 14 years.

In terms of the relative candor of the parties as they testified at trial, I find that the Barkers were direct, cooperative, straightforward and candid in their answers to cross examination questions. By contrast, I find Jeff Hurrell was evasive in response to cross examination on a number of issues. His evasiveness surprised me and seemed a bit out of place given that he was the complaining party and otherwise displayed in his testimony detailed recall and extensive knowledge about minute elements of his claims. The areas where I found him to be evasive include the following: (1) his testimony about the Brassfield Report (Ex. 105), including when he got it, how he reacted to it, his discussions with Brassfield and what he did in response; (2) his testimony about Exhibit 10, a letter he wrote and sent, though no addressee was named in the letter. Considerable cross-examination, redirect questioning and document examination was required to pin down the complete 3-page content of the letter as sent and the precise content of Hurrell's anonymous contractor's comments; and (3) his testimony about the oral recommendations he received from Mark Peterson about the Myers Plumbing Septic Certification. In addition, I found the lengthy Hurrell Exhibit 82 to be troubling. It included

many bills itemizing repair and replacement costs but also many bills that the Hurrells later acknowledged in closing argument they were not seeking to recover from the Barkers.

In addition, I was troubled and slowed considerably in my examination of the written and photographic evidence by the large number of pages of several exhibits introduced by the Hurrells at trial that lacked internal page numbering. The effect was two-fold. First, as introduced, the many pages of both written documents and photographs could not be easily identified, located or discussed during the trial without confusion and unnecessary delays. Secondly, I had to instruct the Hurrell lawyers on several occasions that the material could not be introduced until specific pages were numbered sequentially, thereby wasting substantial court time costly to the process. This was careless and unecessary in light of the Local Bankruptcy Rules of the court. Local Rule 9013-2(b) states, in part: "unless otherwise ordered by the court, all trial exhibits shall be numbered as set forth in Local Bankruptcy Rule 1002-1. . . ." Local Bankruptcy Rule 1002-1(f)(2) states, in part: "Numbering. Exhibits shall be identified at the bottom of each page consecutively to the principal paper. . . ."

In the end, liability for fraud must rest on proof by a preponderance of the evidence of an intent to deceive, not simply on evidence of what the Barkers should have known or suspected about the (1) underlying condition of the foundation slab; (2) conditions prevailing behind finished walls in the house's plumbing; (3) internal, not easily observable structural components of the house; (4) conditions under wall-to-wall carpeting or vinyl flooring, installed by unknown people 14 years before the sale; or (5) the condition of a 40-year old septic system and the grading of the property, both of which were essentially unchanged for the 20-year period of the Barkers' ownership or during their sale of the property to the Hurrells. A careful review and consideration of the evidence in this case leads me to the conclusion that the Hurrells have failed to prove either fraud or an intent, maliciously and willfully, to injure the Hurrells. The losses here were serious, but the evidence does not convince me to hold the Barkers liable on a nondischargeable basis for any loss claimed by the Hurrells.

DATED: September 3, 2008

THOMAS B. DONOVAN
United States Bankruptcy Judge



# MOLD DISCLOSURE

PROPERTY ADDRESS: _26406 Deer Creek W_ DEVELOPMENT: _WOODLANDS_

BUYER AND SELLER ARE HEREBY ADVISED THAT ALLEGATIONS HAVE RECENTLY BEEN MADE AGAINST HOMES IN OUR AREA REGARDING MOLD.

ANY TYPE OF WATER DAMAGE, MOISTURE OR DAMP CONDITIONS MAY RESULT IN THE GROWTH OF MOLD IN A STRUCTURE OR ON ITS CONTENTS. THE WATER DAMAGE MAY BE RELATED TO MANY THINGS: PLUMBING, FIXTURES, SHOWERS, BATHS, SINKS AND TOILET PROBLEMS: APPLIANCES, FIRE PROTECTION SYSTEMS, ROOF OPENINGS, DOOR AND WINDOW DEFECTS AND THEIR CONSTRUCTION DEFECTS. MOLD SPORES ARE EVERYWHERE AND CAN BE FOUND IN THE AIR, FLOORS, CARPETING, INSULATION, WALLS AND CEILINGS WHERE WE LIVE AND WORK. THE MOLD SPORES GENERALLY TURN INTO ACTUAL MOLD WHEN THEY BECOME WET.

THERE ARE A VARIETY OF DIFFERENT TYPES OF MOLDS. CERTAIN TYPES OF MOLD CAN CREATE HEALTH PROBLEMS. THE SEVERITY OF THESE HEALTH PROBLEMS VARIES DEPENDING UPON THE TYPE OF MOLD, THE DEGREE OF EXPOSURE AND THE SENSITIVITY OF THE PERSON EXPOSED TO THE MOLD.

REAL ESTATE BROKERS ARE NOT QUALIFIED TO ASSESS THE PRESENCE OF OR RISKS ASSOCIATED WITH MOLD NOR WILL AN INSPECTION BY A REAL ESTATE BROKER NECESSARILY DISCOVER MOLD. ACCORDINGLY, THE PARTIES ARE ADVISED STRONGLY TO HIRE INDEPENDENT EXPERTS TO INSPECT THE PROPERTY FOR THE PRESENCE AND CAUSE OF MOLD, AS WELL AS POSSIBLE REMEDIES, AND TO ADVISE YOU OF POSSIBLE PHYSICAL OR HEALTH RELATED EFFECTS.

FOR FURTHER INFORMATION, BUYER AND SELLER SHOULD CONTACT THE ENVIRONMENTAL PROTECTION AGENCY AT WWW.EPA.GOV/LAQ AND THE CENTERS FOR DISEASE CONTROL AND PREVENTION AT WWW.CDC.GOV. VISIBLE MOLD OR POTENTIAL AIRBORNE CONTAMINATION CAN BE SAMPLED BY AN ENVIRONMENTAL CONSULTANT AND ANALYZED BY A QUALIFIED LABORATORY. BROKERS DO NOT GUARANTEE THE PERFORMANCE OF EITHER ENVIRONMENTAL CONSULTANTS OR LABORATORIES. BROKERS DO NOT RECOMMEND ANY PARTICULAR CONSULTANT OR LABORATORY. WE SUGGEST THAT BUYERS AND SELLERS SELECT ANY CONSULTANTS AND LABORATORIES OF THEIR OWN CHOOSING.

AS WITH ALL KNOWN DEFECTS, SELLERS ARE TO ADVISE BUYERS OF ANY "KNOWN" WATER LEAKS, SEEPAGES, AND WATER INTRUSIONS IN AND TO THE PROPERTY.

SELLER ADVISES BUYERS OF THE FOLLOWING KNOWN WATER LEAKS, SEEPAGES AND WATER INTRUSIONS: _APPROX. 1990 - washing machine hose broke, (laundry) Room -_ _insurance was notified & They Hired a Contractor to_ _correct any defects to structure. No Problems_ _since._

WE RECOMMEND THAT BUYERS THAT UTILIZE THEIR OWN RESOURCES CHECK OUT THE POSSIBILITY OF MOLD REGARDING THE ABOVE PROPERTY TO SATISFY ANY AND ALL CONCERNS. BUYER HOLDS SELLERS, RE/MAX OF VALENCIA, ALL BROKERS AND AGENTS INVOLVED IN THE TRANSACTION HARMLESS FROM ANY FURTHER OBILIGATION REGARDING THIS MATTER. BUYERS ARE TO UTILIZE THE DISCLOSURES GIVEN AND TO SATISFY THEIR OWN CONCERNS, IF ANY. BUYERS ACKNOWLEDGE THAT THEY HAVE READ THIS DISCLOSURE AND UNDERSTAND ITS CONTENTS.

SELLER _____   SELLER _____   DATE 9/13/04

BUYER _____   BUYER _____   DATE 9/20/04

**RE/MAX** of valencia
25101 The Old Road
Santa Clarita, California 91381
Office: (661) 255-2650
Each office independently owned and operated

GSP Rev. 8/14/01

EXHIBIT 9

APPENDIX A

Myers Pumping Co.
P.O. Box 800352
Santa Clarita CA  91380
661-259-1458

### Septic Certification

Date: 10-2-04

Property Owner: James & Jeanne Barker
Address: 26406 Deer Creek
Phone: 251-7759

Real Estate Co.: Remax
Listing Agent: Neal Weichel
Selling Agent:

Escrow Co.: I.T.C.
Address:
Escrow Officer: Linda Overton
Phone:
Escrow #: 26-31667

### Septic Tank Specifications

Approximate size: 1200 gallons
Constructed of: Concrete
Condition: Septic tank appears to be in good condition at this date of inspection.

Special notes: The water level in the tank was at the very top which is approx. two feet higher than normal. While pumping the tank we experienced large amounts of water backflowing into the tank approx. eight hundred gallons & after a while the water finally stopped.

### Certification work completed

Pump & inspect primary compartment _X__
Pump & inspect primary & secondary compartment ___
Pump & inspect cesspool___
Video main sewer line ___

There is no further guarantee of the working condition of any septic system due to the fact that proper drainage for cesspools & leach lines vary from time to time due to: ( Weather conditions, Non satisfactory soil, & how many people are living in the house ) This certification is for the septic tank only & does not include cesspools or leach lines.

This system complies with local regulations,                    L.A. Co. Health Dept. License # 00072

Job Total: $458.00

READ AND APPROVED

Signature: _____

Ex 22

Ex 103

Page # 2

Myers Pumping Co.
P.O. Box 800352
Santa Clarita CA  91380
661-259-1458

## Septic Certification

Job Address: 26406 Deer Creek

Escrow # 26-31667

This septic tank is connected to an electric pump which when the water level becomes too high can be
turned on manually for one -- two hours & divert water to an additional leach field in the back yard.
I would recommend talking with the property owner to learn more about how to use this pump system &
how often it will be needed.
Being that the pump is operated manually rather than automatic it is possible that water could back up in
the house if not used properly.

READ AND APPROVED

## NOTICE OF ENTRY OF JUDGMENT OR ORDER
### AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST LISTED BELOW:

1.    You are hereby notified that a judgment or order entitled:

MEMORANDUM DECISION

was entered on _____ 9/3/08

2.    I hereby certify that I mailed a true copy of the order or judgment to the persons and

entities listed below on _____ 9/3/08

<u>Attorneys for Plaintiffs</u>
Howard Gould
11601 Wilshire Blvd., Ste. 1900
Los Angeles, CA 90025

Rosendo Gonzalez
515 S. Figueroa St., Ste. 1970
Los Angeles, CA 90071

<u>Attorney for Defendants</u>
Gary Fidler
2719 Wilshire Blvd., 2nd Floor
Santa Monica, CA 90403

<u>Defendants</u>
James and Jeanne Barker
P.O. Box 2251
Livingston, MO 59047

<u>Chapter 7 Trustee</u>
Robert Goodrich
22365 Barton Rd., Ste. 220
Grand Terrace, CA 92313

United States Trustee
Ernst & Young Plaza
725 S. Figueroa St., 26th Floor
Los Angeles, CA 90017

Dated:      9/3/08

_____
Clerk